[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11739
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-03534-ODE


RONALD E. MOORE, JR.,

                                        Plaintiff-Appellant,

versus

GRADY MEMORIAL HOSPITAL CORPORATION,
FULTON-DEKALB HOSPITAL AUTHORITY,
d.b.a. Grady Health System,
KENNETH J. CARNEY, M.D.,
RAPHAEL GERSHON, M.D.,
KELVIN J. HOLLOWAY, M.D., et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 20, 2019)

Before JORDAN, BRANCH, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Ronald E. Moore, M.D. appeals the district court's grant of summary judgment to Grady Memorial Hospital, and related defendants, on his workplace discrimination and retaliation claims under 42 U.S.C. § 1981. Dr. Moore argues that the district court erred in denying his motion to amend his complaint after concluding that his proposed amendment would be futile. Dr. Moore also contends that the district court erred in granting summary judgment to Grady after concluding that he had no valid contractual right upon which to base his § 1981 claims. After a careful review of the record and the parties' briefs, we affirm.

**I**

The allegations surrounding Dr. Moore's claims are well known to the parties and were described in detail in a previous appeal. *See Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1169–71 (11th Cir. 2016) ("*Moore I*"). We recount the material facts here, as developed during discovery.

**A**

Dr. Moore is a licensed, board-certified general surgeon and a specialist in laparoscopic and advanced robotic surgery. In 2011, Morehouse School of Medicine ("MSM") recruited Dr. Moore, an African-American male, to its faculty. Dr. Moore's employment agreement with MSM comprised of three separate

2

appointment letters that MSM sent to Dr. Moore in 2012, 2013, and 2014, as well as MSM's bylaws, which were referenced in the appointment letters. The 2012 letter offered Dr. Moore a conditional appointment as a "Provisional Instructor" until he was approved as an "Assistant Professor." The 2013 letter incorporated the terms of the 2012 letter and confirmed his appointment as an "Assistant Professor." The 2014 letter then renewed Dr. Moore's 2013 appointment. We summarize these letters below.

The 2012 appointment letter included the following provision: "Please remember that while holding a full-time appointment at Morehouse School of Medicine, you are not permitted to practice medicine other than as a member of [MSM's faculty practice plan]. Accordingly, all medical services that you provide must be billed through [MSM's faculty practice plan.]" D.E. 98-7 at 2. While holding a full-time appointment at MSM, 75% of Dr. Moore's time and effort would be devoted to medical services, counseling patients or families, administrative tasks, and clinical services. Dr. Ed Childs, the Chair of the Department of Surgery at MSM, had the authority to assign and change Dr. Moore's work duties. Dr. Moore would not be entitled to receive additional compensation for his clinical practice beyond his stated salary.

Dr. Moore signed similar appointment letters in 2013 and 2014. The 2013 appointment letter stated that "[a]ll other terms and conditions of your previous

appointment letter shall remain in full force." D.E. 98-14 at 1. The 2014 appointment letter reiterated that "while holding a full-time appointment at the Morehouse School of Medicine, [Dr. Moore was] not permitted to practice medicine other than as a member of [the faculty practice plan]." D.E. 98-18 at 2. Both the 2013 and 2014 appointment letters also made Dr. Moore's employment contingent upon entering into a separate employment contract with MSM's faculty practice plan to deliver clinical services.

**B**

To comply with his clinical practice requirements under the agreement, Dr. Moore applied for and was granted clinical privileges at Grady Memorial Hospital ("Grady") in Atlanta, Georgia. Since 2001, MSM and Grady have had an affiliation agreement for clinical services whereby MSM's physicians, through MSM's faculty practice plan, would provide medical care to Grady's patients and train MSM's medical students.

For reasons not relevant to this appeal, Grady suspended Dr. Moore's clinical privileges in July of 2013. This prevented Dr. Moore from performing clinical services at Grady as required by the agreement. Dr. Moore was nevertheless paid his full salary and several bonus payments for that term. Further, despite his privileges being suspended, Dr. Moore's appointment was renewed in 2014.

4

In early January of 2015, Dr. Moore received a letter advising him that MSM would not renew his faculty appointment unless he "obtain[ed] clinical privileges within the next six months." Dr. Moore subsequently applied for and obtained privileges at Piedmont Atlanta Hospital and Dekalb Medical Center in March of 2015, but resigned from MSM soon thereafter. MSM continued to pay Dr. Moore his full salary through June 30, 2015.

## C

In October of 2013, Dr. Moore sued Grady and multiple related defendants, alleging violations of § 1981; 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; and 42 U.S.C. § 1986. Dr. Moore also asserted two state-law claims—one for breach of MSM's bylaws and the other for intentional infliction of emotional distress.

"Among the many statutes that combat racial discrimination, § 1981 . . . has a specific function: It protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (quoting § 1981(a)). "To state a claim of race discrimination under § 1981, plaintiffs must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute."

5

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004) (footnote call number omitted).  Such enumerated activities include the right to "make and enforce contracts."  § 1981(a), (b).  Therefore, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza*, 546 U.S. at 476 (footnote omitted).

In the previous appeal, we concluded that the district court erred in dismissing Dr. Moore's § 1981 claims and held that Dr. Moore's contract with MSM could satisfy § 1981's contract requirement, possibly allowing him to bring suit against Grady. *See Moore I*, 834 F.3d at 1174, 1176.  On remand, the magistrate judge therefore considered "whether there was even a valid and enforceable contract in place [between Dr. Moore and MSM] that could have been impaired[.]"  D.E. 115 at 2.

Following remand, Dr. Moore filed a motion to amend his complaint to restate state-law claims that the district court had dismissed in the first appeal and to raise three new state-law claims for tortious interference.  The magistrate judge denied Dr. Moore's motion to amend, concluding that amendment would be futile.  Dr. Moore did not object to or appeal the magistrate judge's decision prior to this appeal.

After some discovery on the issue of whether Dr. Moore had a valid contract with MSM on which to base his § 1981 claims, the defendants moved for summary judgment.  The magistrate judge issued a report recommending that the district court

grant summary judgment to the defendants.  The report concluded that Dr. Moore entered into a contractual relationship with MSM, but that he violated the exclusivity provisions of the agreement prior to Grady's alleged interference by practicing medicine outside his relationship with MSM.  The relevant facts follow.

From October of 2005 until at least 2016, Dr. Moore was also employed by a Florida corporation, Trauma and Critical Care Associates, Inc. ("TCCA").  As a TCCA employee, Dr. Moore provided trauma services at Broward General Medical Center in Fort Lauderdale, Florida.  Broward General's records show that from August 1, 2012 through December of 2014, Dr. Moore performed over 500 procedures and over 200 outpatient services.  These procedures resulted in Dr. Moore earning $98,453 in 2012, $87,372 in 2013, and $74,304 in 2014.

At the same time, Dr. Moore owned and operated Minimally Invasive Surgery, Inc. ("MIS"), a Florida corporation.  Dr. Moore conducted his private solo medical practice through MIS.  In his employment application for MSM, Dr. Moore represented that he would stop working for MIS if he accepted the position at MSM. The Florida Secretary of State's records, however, show that MIS filed annual reports from 2012 through 2015, and MIS' tax returns reflect a six-figure gross income for Dr. Moore every year from 2012 to 2014.  Dr. Moore's federal tax filings reported that, from 2012 to 2014, MIS was his primary medical practice and claimed that the time he spent working in Atlanta for MSM was out-of-town travel for MIS.

Owing to these breaches, the district court concluded that Dr. Moore could no longer rely on his agreement with MSM to satisfy the contractual element of his § 1981 claims. *See Domino's Pizza*, 546 U.S. at 476. The district court fully adopted the magistrate judge's report and overruled Dr. Moore's objections. This appeal followed.

## II

We first address Dr. Moore's argument that the magistrate judge erred in denying his motion to amend after concluding that amendment would be futile. We then turn to whether the district court properly granted summary judgment on Dr. Moore's § 1981 claims.

## A

Dr. Moore contends that the magistrate judge should have allowed him to amend his complaint to reassert state-law claims, which the district court dismissed without prejudice before his first appeal, and to bring new state-law claims for tortious interference. The magistrate judge denied Dr. Moore's motion to amend because it concluded that amendment would be futile. *See Bryant v. Dupree*, 252 F.3d 1161, 1163–64 (11th Cir. 2001). The magistrate judge reasoned that Dr. Moore abandoned his state-law claims by failing to appeal their dismissal alongside the dismissal of his § 1981 claims, and that Dr. Moore's new state-law claims for tortious interference failed as a matter of law because the alleged interloper—

Grady—was not a stranger to the agreement. *See Cox v. City of Atlanta*, 596 S.E.2d 785, 788 (Ga. Ct. App. 2004) ("To be liable for tortious interference with business relations, one must be a stranger to the business relationship giving rise to and underpinning the contract."). *See also Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 503 S.E.2d 278, 282–83 (Ga. 1998) (articulating the "stranger" requirement for tortious interference claims).

"Although we review a district court's denial of a motion to amend only for abuse of discretion, we review de novo a decision that a particular amendment to the complaint would be futile. Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) (per curiam) (internal citation omitted). We conclude that Dr. Moore waived his right to appeal this issue, and, even if he did not, that the district court did not abuse its discretion in denying his motion to amend.

A party has 14 days to object to a magistrate judge's order on a nondispositive pretrial matter. *See* Fed. R. Civ. P. 72(a). If the party fails to timely object to the magistrate judge's order, he or she "may not assign as error a defect in the order." *Id. See also Smith v. School Bd. of Orange Cty.*, 487 F.3d 1361, 1365 (11th Cir. 2007) ("[W]here a party fails to timely challenge a magistrate's nondispositive order

before the district court, the party waive[s] his right to appeal those orders in this Court.").

In the present case, the magistrate judge's order "did not dispose[ ] of a claim or defense of any party," and Dr. Moore does not contend that the order denying his motion to amend was a dispositive order. *Smith*, 487 F.3d at 1365. In any event, other circuits have concluded that an order denying a motion to amend is nondispositive for the purposes of Rule 72(a). *See Daley v. Marriott Int'l, Inc.,* 415 F.3d 889, 893 n.9 (8th Cir. 2005); *Cont'l Cas. Co. v. Dominick D'Andrea, Inc.,* 150 F.3d 245, 251 (3d Cir. 1998); *Pagano v. Frank,* 983 F.2d 343, 346 (1st Cir. 1993).

Dr. Moore filed a motion to amend his complaint on February 10, 2017. The magistrate judge denied the motion to amend on June 20, 2017. At that point, Dr. Moore had 14 days to object to the magistrate judge's order, but he failed to do so. Dr. Moore therefore waived his right to appeal the order. *See* Fed. R. Civ. P. 72(a); *Smith*, 487 F.3d at 1365.

Dr. Moore argues that under 11th Circuit Rule 3-1, we can review the magistrate judge's denial of his motion to amend "for plain error if necessary in the interests of justice." We note, however, that the magistrate judge denied the motion to amend in an order, *see* 28 U.S.C. § 636(b)(1)(A), and Rule 3-1 applies specifically to "findings or recommendations contained in a report and recommendation." 11th Cir. R. 3-1.

10

Moreover, even if Dr. Moore had not waived his right to appeal, the magistrate judge did not abuse his discretion in denying the motion to amend. *See Carruthers*, 357 F.3d at 1217. "Although leave to amend shall be freely given when justice so requires, a motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003) (cleaned up). We agree with the magistrate judge's conclusion that Dr. Moore's proposed amendments were futile.

First, Dr. Moore sought to reassert state-law claims that the district court dismissed without prejudice prior to his initial appeal. Dr. Moore, however, abandoned these state-law claims by failing to appeal their dismissal in the first appeal. In *Moore I*, 834 F.3d at 1171, "Dr. Moore's appeal concern[ed] only the § 1981 claims," and he did not appeal the dismissal of his state-law claims. Issues, including the exercise of supplemental jurisdiction over state-law claims, are deemed abandoned if not briefed on appeal. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). Dr. Moore concedes that in *Timson*, 518 F.3d at 874, we ruled that the plaintiff-appellant abandoned his pendent state-law claims by failing to properly appeal the dismissal of those claims.

Second, Dr. Moore's proposed amended complaint sought to assert new state-law claims for tortious interference. The district court concluded, however, that the

11

proposed tortious interference claims would fail as a matter of law because (a) the claims did not allege specific facts against individual defendants, and (b) the defendants were not "strangers" to Dr. Moore's business relationship with MSM. On appeal, Dr. Moore attempts to restate the allegations related to each defendant, but he presents nothing to show that the district court erred in concluding that the defendants were not "strangers."

To state a claim for tortious interference under Georgia law, plaintiff must prove, among other things, that the alleged intermeddler acted improperly or wrongfully and without privilege. *See Rowell v. Phoebe Putney Mem'l Hosp., Inc.*, 791 S.E.2d 183, 185 (Ga. Ct. App. 2016) (quoting *Culpepper v. Thompson*, 562 S.E.2d 837, 840 (Ga. Ct. App. 2002)). To act without privilege, the defendant "must be a stranger to the business relationship giving rise to and underpinning the contract." *Cox*, 596 S.E.2d at 788. *See also Benefit Support, Inc. v. Hall Cty.*, 637 S.E.2d 763, 770 (Ga. Ct. App. 2006). Proof that the defendant was not a stranger to the business relations at issue is, therefore, fatal to a claim of tortious interference with business relations. *See id.*

A party is not a stranger to the business relationship giving rise to a contract if it has a "legitimate interest in either the contract or a party to the contract," and the fact that a defendant did not sign the contract does not preclude a finding that he was no stranger to the contract. *Cox*, 596 S.E.2d at 788. *See also Cook Pecan Co.,*

12

*Inc. v. McDaniel*, 810 S.E.2d 186, 190–91 (Ga. Ct. App. 2018).  In sum, "parties to an interwoven contractual arrangement" cannot be liable for tortious interference with the contracts within that business relationship.  *See Iraola v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1283–84 (11th Cir. 2003).

We agree with the magistrate judge's conclusion that Dr. Moore failed to show that the defendants were strangers to his business relationship with MSM. Paragraphs 117 through 121 of the proposed amended complaint simply restate the elements of a tortious interference claim under Georgia law, and other allegations establish that Dr. Moore, MSM, Grady, and the other defendants were "all parties to an interwoven contractual arrangement."  *Iraola*, 325 F.3d at 1284.

To recap, in January of 2013, Grady entered into an affiliation agreement with MSM.  Pursuant to the agreement, MSM's faculty would provide certain medical services at Grady in addition to their teaching responsibilities.  Grady receives approximately $750 million to sustain its clinical practice, which is divided between Emory University School of Medicine and MSM.  Before Dr. Moore could be appointed to the MSM faculty he was required to obtain clinical privileges at Grady. Dr. Moore, accordingly, applied for and received special surgical privileges to perform procedures at Grady.

Based on these allegations, the district court correctly concluded that Dr. Moore's proposed tortious interference claims would fail as a matter of law.

13

**B**

Dr. Moore also contends that the district court erred in granting the defendants' motion for summary judgment on his § 1981 claims.  We disagree.

The magistrate judge and the district court both concluded that Dr. Moore had no valid contractual right to be impaired—a necessary element for a § 1981 claim—after he breached his employment agreement by performing medical services outside his relationship with MSM.  Dr. Moore concedes that the 2012, 2013, and 2014 appointment letters, and MSM's incorporated bylaws, formed a valid contract between himself and MSM.  Dr. Moore asserts, however, that the district court failed to view the facts in the light most favorable to him and that he was not bound by the exclusivity provisions in the appointment letters.  Grady responds that the exclusivity provisions governed Dr. Moore's agreement with MSM, and that his undisclosed Florida medical practices violated those provisions and materially breached the agreement.

We review a district court's summary judgment rulings de novo, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party.  *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "If the nonmoving party fails to 'make a showing sufficient to establish the existence

14

of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Craig v. Floyd Cty.*, 643 F.3d 1306, 1309 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

"The effect of a material or substantial breach of contract is, generally, to preclude the party guilty of the first such breach from recovering on the contract and to render him or her liable to the injured party for the resulting loss or injury." *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 862 (11th Cir. 2013) (William Pryor, J., concurring in part and dissenting in part) (quoting 17B C.J.S. Contracts § 752 at 199 (2011)).  Under Georgia law, where a party refuses to abide by a contract provision, that party is properly considered to have repudiated the contract and as such is properly considered to have breached the contract, which estops that party from seeking to enforce the provisions of the agreement. *See Forest Commodity Corp. v. Lone Star Indus., Inc.*, 564 S.E.2d 755, 757–58 (Ga. Ct. App. 2002).  Breaching a contract therefore extinguishes any right to recovery that the breaching party may have previously had.  *See id.* at 248.  However, "[w]hen [the other] party knows a contract has been breached and continues to perform or accept performance under the contract, that party can be said to have made an election" and "has ended its right to refuse to perform[.]"  *Clower v. Orthalliance, Inc.*, 337 F.

15

Supp. 2d 1322, 1331 (N.D. Ga. 2004) (citing *S. Sav. Bank v. Dickey*, 199 S.E. 546, 548–49 (Ga. Ct. App. 1938)).

On appeal, Dr. Moore restates several of the arguments that the district court rejected.    Only one of Dr. Moore's arguments merits further discussion: the contention that MSM waived the agreement's exclusivity provisions through conduct.  We reject Dr. Moore's other arguments for the reasons stated in the district court's order.

Dr. Moore argues that, even if he did breach his employment agreement, MSM waived the exclusivity provisions by its course of dealing.  To prove waiver by conduct, Dr. Moore must offer evidence of "acts or omissions that are so manifestly consistent with an intent to relinquish a then-known particular right or benefit that no other reasonable explanation of [the] conduct is possible." *Eckerd Corp. v. Alterman Props., Ltd.*, 589 S.E.2d 660, 664 (Ga. Ct. App. 2003).  Even when viewing the evidence in the light most favorable to the party claiming waiver, proving waiver by conduct is an exceptionally high bar.  *See Greenberg Farrow Architecture, Inc. v. JMLS 1422, LLC*, 791 S.E.2d 635, 640 (Ga. Ct. App. 2016) ("[T]he law will not infer the waiver of an important contract right unless the waiver is *clear and unmistakable*. . . . Indeed, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right[.]") (emphasis in original). Although waiver is generally a question of fact for the jury, it may be a question of

16

law "when the facts and circumstances essential to the question are clearly established." *Id.*

Dr. Moore points to multiple facts that, when "taken together," purportedly show that "MSM did not expect strict compliance with any exclusivity clause." First, he argues that the appointment letters allow Dr. Moore to change his duties through oral agreements with Dr. Childs. This is true, but Dr. Moore does not present admissible evidence that Dr. Childs in fact modified the agreement. Second, Dr. Moore says he did not comply with other provisions of the agreement that required him to spend a certain percentage of time performing clinical work and to enter into an agreement with MSM's faculty practice, yet MSM did not inform him that he was in breach. Third, Dr. Moore points out that MSM continued to pay him his full salary after Grady suspended his privileges.

These facts miss the point. The district court concluded that the waiver-by-conduct argument failed because Dr. Moore failed to show evidence establishing that MSM knew he was practicing outside medicine in violation of the agreement. If MSM did not know of the violation, then it follows that it could not knowingly waive the right to exclusively retain Dr. Moore's medical services. *See Greenberg*, 791 S.E.2d at 641 ("One cannot intentionally waive a right one does not know exists."). Although the facts that Dr. Moore presents, viewed in the light most

17

favorable to him, may support waiver of other provisions, they do not support waiver of the exclusivity requirement.

As the district court noted, there is evidence in the record that MSM knew when it hired Dr. Moore that he had a medical practice in Florida and existing obligations to institutions in Florida. However, Dr. Moore points to no evidence that MSM knew that Dr. Moore continued to provide services outside of his relationship with MSM after signing the 2012 appointment letter.

Finally, there are possible explanations for MSM's conduct, other than an intent to waive the exclusivity provisions. *See Eckerd Corp.*, 589 S.E.2d at 664 (suggesting that "other reasonable explanation[s]" may disprove waiver by conduct). The district court noted a few:

> [A]lternate explanations are available for each proposition offered by Plaintiff as evidence of an intent to waive the exclusivity provisions . . . . MSM may have assumed Plaintiff would get his privileges back quickly or believed he had enough work to do outside of his clinical practice. . . . MSM may have simply wanted to give its new hire a chance to get back on track, and believed he was still contributing enough as a faculty member to deserve his full salary. MSM, perhaps, even believed it was legally required pursuant to the contract to pay Plaintiff his full salary notwithstanding his loss of Grady privileges.

D.E. 115 at 18. On appeal, Dr. Moore does not address these alternative explanations.

18

Because Dr. Moore violated the agreement's exclusivity provisions, he lacks a valid contractual right upon which to base his § 1981 claims.

## III

For the foregoing reasons, we affirm the magistrate judge's denial of Dr. Moore's motion to amend, and we affirm the district court's grant of summary judgment to the defendants.

**AFFIRMED.**